

**IT IS HEREBY ADJUDGED and DECREED that the below described is SO ORDERED.**

**Dated: March 07, 2019.**

_Craig A. Gargotta_
_____
**CRAIG A. GARGOTTA**
**UNITED STATES BANKRUPTCY JUDGE**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 18-50085-CAG |
| | § | |
| FIRST RIVER ENERGY, LLC, | § | CHAPTER 11 |
|     Debtor. | § | |

| | | |
|---|---|---|
| DEUTSCHE BANK TRUST COMPANY | § | |
| AMERICAS, AGENT, | § | |
|     Plaintiff, | § | |
| | § | |
| v. | § | ADVERSARY NO. 18-05015-CAG |
| | § | |
| FIRST RIVER ENERGY, LLC, Debtor-in-Possession; | § | |
| U.S. ENERGY DEVELOPMENT CORPORATION; | § | |
| AGERON ENERGY, LLC; PETROEDGE ENERGY IV, | § | |
| LLC; TEAL NATURAL RESOURCES, LLC; | § | |
| VICEROY PETROLEUM, LP; RLU OPERATING, | § | |
| LLC; DEWBRE PETROLEUM CORPORATION; | § | |
| JERRY C. DEWBRE, TRUSTEE; AMERICAN | § | |
| SHORELINE, INC.; TEXPATAPIPELINE COMPANY; | § | |
| AURORA RESOURCES CORPORATION; AWP | § | |
| OPERATING CO.; TEXRON OPERATING CO.; | § | |
| GALVESTON BAY OPERATING CO. LLC; | § | |
| MAGNUM PRODUCING, LP; MAGNUM | § | |
| ENGINEERING COMPANY; MAGNUM OPERATING | § | |
| LLC; ROCK RESOURCES, INC; KILLAM OIL CO., | § | |
| LTD.; AND ENERGY RESERVES GROUP, LLC, | § | |
|     Defendants. | § | |

## MEMORANDUM OPINION GRANTING, IN PART AND DENYING, IN PART AGENT'S MOTION FOR SUMMARY JUDGMENT AND ALTERNATIVE MOTION FOR PARTIAL SUMMARY JUDGMENT (ECF NO. 89)

Came on for consideration Agent's Motion for Summary Judgment and Alternative Motion for Partial Summary Judgment[1] (ECF No. 89) ("Motion for Summary Judgment"), Agent's Appendix of Facts in Support of Motion for Summary Judgment and Agent's Supplement to: Motion for Summary Judgment and Alternative Motion for Partial Summary Judgment (ECF Nos. 90, 96) ("Agent's Appendix"), RADCO Operations, LP and RHEACO, LTD.'s Response to Agent's Motion for Summary Judgment and Alternative Motion for Partial Summary Judgment (ECF No. 103) ("Intervenors' Response"), Producer Group's Response to Agent's Motion for Partial Summary Judgment or Alternatively, Motion for Partial Summary Judgment (ECF No. 105) ("Producers' Response"), and Agent's Amended Reply to: (1) RADCO Operations, LP and RHEACO, LTD.'s Response to Motion for Summary Judgment and Alternative Motion for Partial Summary Judgment; and (2) Producer Group's Response to Motion for Partial Summary Judgment and Alternative Motion for Partial Summary Judgment (ECF No. 110) ("Agent's Reply"). This Court took the matter under advisement. For the reasons stated herein, the Court finds that Agent's Motion for Summary Judgment is GRANTED, IN PART and DENIED, IN PART.

## JURISDICTION

As an initial matter, the Court finds that it has jurisdiction over this proceeding under 28 U.S.C. §§ 1334 and 157(a) and (b)(1). This matter is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (B), (K), and (O). All parties have filed a Statement Regarding Consent that consents to the Court's entry of final orders and final judgment. (ECF Nos. 57, 62, 63). This matter

---

[1] Agent's Motion for Summary Judgment and Alternative Motion for Partial Summary Judgment seeks relief in two ways. First, Agent requests summary judgment on all claims asserted in Agent's Complaint to Determine the Validity, Priority and Extent of Liens and Security Interests (ECF No. 1) ("Complaint"). Second, Agent requests that the Court deny all affirmative defenses and counterclaims asserted in Producers' Original Answer and Original Counterclaim (ECF No. 50), Producers' Amended Answer and First Amended Counterclaim (ECF No. 70), Intervenor RADCO Operations, LP's Original Answer and Original Counterclaims Against Agent (ECF No. 93), and Intervenor RHEACO, Ltd.'s Original Answer and Original Counterclaims Against Agent (ECF No. 94) (collectively referred to hereinafter as "Answer/Counterclaims").

is within the Court's jurisdiction and authority pursuant to the Supreme Court's ruling in ***Wellness Int'l Network, Ltd. v. Sharif (In re Sharif)***, 135 S.Ct. 1932 (2015).

<u>**FACTUAL BACKGROUND**</u>

On January 12, 2018 ("Petition Date"), First River Energy, LLC ("Debtor" or "First River") filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Delaware Bankruptcy Court"). On January 17, 2018, the Delaware Bankruptcy Court transferred venue of this case *sua sponte* to the United States Bankruptcy Court for the Western District of Texas, San Antonio Division. Debtor continues to operate its business and manage its property as a debtor-in-possession pursuant to 11 U.S.C. §§ 1107(a) and 1108.

Based on the Court's review of the facts and exhibits presented in the moving papers, along with the documents included in Agent's Appendix, the Court finds following undisputed facts.

**A. <u>General Business Operations</u>**

Prior to the Petition Date, Debtor provided midstream transportation services to the oil and gas industry across the southwestern United States and Great Plains. As a midstream service provider, Debtor purchased and marketed domestic crude oil and condensate directly from upstream producers. After purchasing oil from upstream producers, Debtor re-sold and delivered aggregated oil to third-party downstream purchasers through a combination of trucks and pipeline.

**B. <u>Debtor's Relationship with Producers</u>**

Pre-petition, Debtor entered into agreements with a number of upstream oil and gas producers to purchase oil and gas from wells situated in Texas and Oklahoma. The following upstream producers are defendants in the numbered adversary proceeding: U.S. Energy Development Corporation; Ageron Energy, LLC; Petroedge Energy IV, LLC; Teal Natural

Resources, LLC; Crimson Energy Partners IV, LLC; Viceroy Petroleum, LP; RLU Operating, LLC; Dewbre Petroleum Corporation; Jerry C. Dewbre, Trustee; American Shoreline Inc.; Texpata Pipeline Company; Aurora Resources Corporation; AWP Operating Co.; Texron Operating LLC; Magnum Producing, LP; Magnum Engineering Company; Magnum Operating LLC; Rock Resources, Inc.; Killam Oil Co., Ltd.; and Energy Reserves Group, LLC (collectively referred to hereinafter as "Producers"). Generally, the terms of Producers' sale of oil to Debtor were delineated in purchase contracts ("Producer Agreements") entered into by Debtor and Producers individually. Pursuant to the Producer Agreements, Producers produced and delivered oil and gas to Debtor, who, in turn, would pay Producers on the twentieth day of the month following delivery.

During the relevant period (from December 1 through December 31, 2017), Producers sold Debtor oil and gas produced from wells located in Texas and Oklahoma. Under the terms of the Producer Agreements, Debtor was required to pay Producers for oil and gas provided in December 2017 on January 20, 2018. Debtor discontinued business operations on or about December 31, 2018. Debtor filed for chapter 11 bankruptcy protection on January 12, 2018.

As of the Petition Date, Debtor had not paid Producers for oil and gas provided in December 2017. Seeking payment from Debtor for unpaid invoices for December 2017 oil and gas sales, certain members of the Producers group[2] filed proofs of claim in Debtor's bankruptcy case asserting claims for amounts owed secured by Debtor's oil, gas, and proceeds thereof under Tex. Bus. & Com. Code Ann. § 9.343 ("Texas § 9.343"). Producer U.S. Energy Development Corporation filed a proof of claim in Debtor's bankruptcy case for amounts owed secured by

---

[2] Galveston Bay Operating Co., LLC did not file a proof of claim in Debtor's bankruptcy case. Energy Reserves Group, LLC filed a proof of claim for "oil sold to debtor," but did not assert that its claim was secured under Tex. Bus. & Com. Code Ann. § 9.343 (West 2017) or otherwise. *Proof of Claim of Energy Reserves Group LLC*, Case No. 18-50085 (Claim No. 28-1).

4

Debtor's oil, gas, and proceeds thereof under Texas § 9.343 and Okl. Stat. Ann. tit. 52, § 549. *Proof of Claim of U.S. Energy Dev. Corp.*, Case No. 18-50085 (Claim No. 251-1).

    **C.** <u>**Debtor's Relationship with Intervenors**</u>

        RADCO Operations, LP ("RADCO") and RHEACO, Ltd. ("RHEACO") (collectively referred to hereinafter as "Intervenors"), who also produced and sold oil products to Debtor pre-petition, are intervening parties in this matter. Intervenors produced oil and gas in the state of Texas.  On or about April 24, 2012, RADCO entered into a Crude Oil Purchase Agreement with O.G.O Marketing, LLC, a Texas limited liability company ("RADCO Purchase Agreement"). *Intervenors' Response*, Ex. A (ECF No. 103). Pursuant to the RADCO Purchase Agreement, RADCO produced and sold crude oil and condensate to Debtor. RHEACO was unable to produce a copy of a purchase contract with O.G.O. Marketing, LLC, but asserts in Intervenor's Response that it entered into an agreement similar to the RADCO Purchase Agreement. Like RADCO, RHEACO produced and sold oil and gas to Debtor.

        In September 2013, O.G.O. Marketing, LLC changed its name to Texas Gathering Company, LLC and continued as a Texas limited liability company. *Intervenors' Response*, Ex. B (ECF No. 103). RADCO continued conducting business with Texas Gathering Company, LLC under the RADCO Purchase Agreement. On or about July 23, 2015, Texas Gathering Company, LLC was acquired by Debtor in this case, First River. First River is a Delaware limited liability company.

        RADCO and RHEACO continued to produce crude oil in Texas and sell it to Debtor through December 2017. Pursuant to the RADCO Purchase Agreement, payment for crude oil sold and delivered was to be made by wire transfer on the twenty-third day of the month following the month of delivery. *Intervenors' Response*, Ex. A (ECF No. 103). Debtor would have been required

to pay Producers for oil and gas provided in December 2017 on January 23, 2018. Debtor, however, filed for bankruptcy on January 12, 2018, which is before payment of December 2017 invoices became due to Intervenors. As of the Petition Date, Debtor had not paid Intervenors for oil provided in December 2017.

**D. Pre-Petition Loan Documents**

On July 23, 2015, a credit agreement (the "Credit Agreement") was entered into under the laws of the state of Delaware by and among (i) First River Energy, LLC as borrower; (ii) Deutsche Bank AG New York Branch as collateral agent and as a Lender, Issuing Lender, Swing Line Lender ("Lender"); (iii) Deutsche Bank Trust Company Americas as Administrative Agent ("Agent"); and (iv) several banks and other financial institutions or entities as lenders. *Agent's App'x*, Pt. 1 (ECF No. 90-2). To guarantee payment of the Credit Agreement, Debtor entered into a guarantee agreement ("Guarantee Agreement") with Agent and Lender on July 23, 2015, under which Debtor assumed its role as a guarantor for debt issued under the Credit Agreement. *Agent's App'x*, Pt. 2 (ECF No. 90-3). On July 23, 2015, Debtor entered into a security agreement ("Security Agreement") with Agent and Lender. *Agent's App'x*, Pts. 2, 3 (ECF No. 90-3, 90-4). The terms of the Security Agreement granted Agent a continuing security interest ("Bank Security Interest") in substantially all of Debtor's assets, including:

> [A]ll Accounts, Chattel Paper, Commercial Tort Claims, Commodity Accounts, Computer Hardware and Software Collateral, Copyright Collateral, Deposit Accounts, Documents, Equipment, Fixtures, General Intangibles, Instruments, Intellectual Property Collateral, Inventory and all other Goods, Investment Property, Letter of Credit Rights, Patent Collateral, Payment Intangibles, Securities Accounts, Trademark Collateral, and Supporting Obligations, wherever located, in which any Grantor now has or hereafter acquires any right, title or interest, and the Proceeds (including Stock Rights), insurance proceeds and products thereof . . . .

*Agent's App'x*, Pt. 3 (ECF No. 90-4). To perfect the Bank Security Interest, Agent executed UCC-1 financing statements with the Delaware Department of State on July 23, 2015 that covered "all

assets of Debtor, wherever located, whether now owned and existing or hereafter acquired or coming into existence, together with all proceeds thereof." *Agent's App'x*, Pt. 9 (ECF No. 90-8). Agent filed amendments to the UCC-1 financing statements in Delaware that caused its Bank Security Interest to remain continuously effective since July 23, 2015. *Agent's App'x*, Pt. 9 (ECF No. 90-8).

### E.  Deposit Account Control Agreement

Debtor's Schedule A/B demonstrates that Debtor maintained deposit accounts at JPMorgan Chase Bank, N.A. ("JPMorgan Chase") and at Deutsche Bank. *Schedule A/B: Assets- Real and Personal Property*, Case No. 18-50085, (ECF No. 191). On July 23, 2015, Debtor, JPMorgan Chase (as depositary), and Agent (as secured party) entered into a Blocked Account Control Agreement (the "Blocked Account Control Agreement") in which Agent was granted a security interest in all of Debtor's funds on deposit in accounts at JPMorgan Chase. *Agent's App'x*, Pt. 5 (ECF No. 90-4). The Blocked Account Control Agreement indicates that its terms "shall be governed by and construed in accordance with the laws of the State of New York" because "the State of New York is the jurisdiction of [JPMorgan Chase] as [d]epositary for purposes of [s]ection 9-304(b) of the Uniform Commercial Code." *Agent's App'x*, Pt. 5, ¶ 11 (ECF No. 90-4).

Debtor, JPMorgan Chase, and Agent entered into Amendment No. 1 to the Blocked Account Control Agreement ("Amendment No. 1") on January 31, 2017. *Agent's App'x*, Pt. 6 (ECF No. 90-5). The terms of Amendment No. 1 deleted two accounts from the initial Blocked Account Control Agreement and amended Debtor's company name from First River Midstream, LLC to First River Energy, LLC. Otherwise, the terms of the Blocked Account Control Agreement, including the New York choice-of-law provision, remain unchanged. *Agent's App'x*, Pt. 6 (ECF No. 90-5).

**F. Events Leading to Bankruptcy**

In November and December 2017, Debtor defaulted on making payments due under the terms of the Credit Agreement. On or about December 31, 2017, Debtor discontinued nearly all of its transactions involving the purchase and sale of oil,[3] including those with Producers, Intervenors, and downstream purchasers. When Debtor filed for bankruptcy on January 12, 2018, Debtor had not paid Producers and Intervenors for any oil and gas purchases made in December 2017. Likewise, downstream purchasers had not paid Debtor for any oil and gas purchased from Debtor in December 2017.

**G. Producer Claims Procedure Orders**

Agent, Producers, and Intervenors each allege that they have a properly perfected, first priority security interest in Debtor's oil and gas production, deposit accounts, and resulting proceeds, including accounts receivable. To avoid a multiplicity of legal actions and have all claims to such collateral heard in one action, Debtor filed an Expedited Motion to Establish Procedures for the Resolution of Claims and Liens Against Estate Property in the bankruptcy case (Case No. 18-50085, ECF No. 331). After a hearing on March 28, 2018, the Court entered an Order Granting Expedited Motion to Establish Procedures for the Resolution of Claims and Liens Against Estate Property (Case No. 18-50085, ECF No. 413) (the "Claims Procedure Order").

The Claims Procedure Order establishes that this adversary proceeding serves as a declaratory judgment action to determine the extent, validity, and priority of liens and other interests in "any or all of the [oil products allegedly purchased by Debtor prior to the Petition Date]

---

[3] The Affidavit of Deborah Kryak, CEO of First River, states that Debtor transacted in the sale and purchase of approximately $20,000 of oil in January 2018 prior to the Petition Date. *Agent's App'x*, Pt. 16 (ECF No. 90-15).

and/or its proceeds, including accounts receivable,[4] cash, or cash deposit proceeds from the Debtor's sale of [oil]." (Case No. 18-50085, ECF No. 413). The Claims Procedure Order further determines that this adversary proceeding shall be the "sole and exclusive method of litigating conflicting claims" regarding "any legal or equitable claims to ownership, entitlement, recovery or lien rights including, without limitation, perfection and priority of such lien rights" in oil products and proceeds, including accounts receivable, cash, or cash deposit proceeds from Debtor's sale of oil and gas. (Case No. 18-50085, ECF No. 413).

## THE PARTIES' CONTENTIONS

Agent has filed its Motion for Summary Judgment, which asserts that Agent is entitled to summary judgment that: (a) Agent and Lenders have valid, perfected first-priority liens on Debtor's accounts receivable, deposit accounts and inventory, (b) Producers have no liens on Debtor's accounts receivable, deposit accounts and inventory, or alternatively, even if Producers had liens, liens held by Agent and Lenders have priority, (c) Producers' affirmative defenses are without merit, and (d) Producers should be denied recovery under their counterclaims. *Motion for Summary Judgment*, (ECF No. 89).

Agent asserts that, as of the Petition Date, Debtor had the following assets eligible for distribution among the parties: (a) $27,613,066.81 in accounts receivable owed from downstream purchasers for oil sold;[5] (b) cash, cash equivalents, and financial assets of $1,190,256.00; and (c) inventory with a scheduled value of $1,894,701.79 and a "lower of cost or market value" of $150,000. *Debtor's July 2018 Monthly Operating Report*, Case No. 18-50085 (ECF No. 629), *see*

---

[4] The Claims Procedure Order provides that "accounts receivable" include the accounts receivable scheduled in Debtor's Schedule A/B in the amount of $27,613,066.81 and any cash collected from such receivables. (Case No. 18-50085, ECF No. 413).

[5] As of June 2018, Debtor had collected all outstanding accounts receivable from downstream purchasers. *Debtor's July 2018 Monthly Operating Report*, Case No. 18-50085 (ECF No. 629).

*also Agent's App'x*, Pt. 16 (ECF No. 90-15).

### A. Agent's Contentions

In its Motion for Summary Judgment, Agent argues first that Producers waived any right they had to assert a security interest in goods, inventory, accounts, and proceeds under Texas § 9.343 because the Producer Contracts included Conoco Phillips General Provisions[6] language. Agent also argues in its Reply that the RADCO Purchase Agreement contained waiver language similar to the Conoco Phillips General Provisions that resulted in Intervenors waiving their right to assert a security interest in goods, inventory, accounts, and proceeds under Texas § 9.343.

Alternatively, Agent claims that there is a conflict of law between Delaware and Texas law regarding perfection and priority of security interests in Debtor's goods, inventory, accounts, and proceeds. Agent uses Restatement (Second) Conflict of Laws § 6(1) to argue that the laws of the state of Delaware govern perfection of security interests on Debtor's goods, inventory, accounts, and proceeds pursuant to the choice-of-law provisions in the Uniform Commercial Code ("UCC"). *See* Del. Code Ann. tit. 6, § 9-301 (West 2018); *see also* Tex. Bus. & Com. Code Ann. § 9.301. Agent argues that because it was the first creditor to file a financing statement with the Delaware Department of State, its security interest in substantially all of Debtor's assets primes any security interest alleged by Producers and Intervenors in the same collateral. Moreover, Agent argues that Producers and Intervenors hold unsecured claims to the extent that they did not file financing statements with the Delaware Department of State.

In the alternative, Agent asserts that even if Producers and Intervenors can establish that

---

[6] Conoco Phillips General Provisions are general terms and conditions that are referenced in ConocoPhillips' contracts for crude oil and condensate in the United States. General Terms & Conditions for U.S. Crude Oil Contracts, http://www.conocophillips.com/about-us/how-energy-works/doing-business-with-us/general-terms-conditons-for-u-s-crude-oil-contracts/. Conoco Phillips General Provisions are a "standard-form industry document . . . [that] sets forth certain general rules to govern domestic oil trading." *Lion Oil Trading & Transp., Inc. v. Statoil Mktg. & Trading (US) Inc.*, 728 F.Supp.2d 531, 532–33 (S.D.N.Y. 2010).

Texas § 9.343 applies, Agent's perfected security interests in Debtor's accounts receivable, proceeds and deposit accounts have priority over Producers and Intervenors' liens by virtue of the limitations of Tex. Bus. & Com. Code Ann. § 9.343(f). Specifically, Agent asserts that the oil held by Producers for resale was inventory, and Producers and Intervenors did not perfect their PMSI in inventory properly under Delaware law, which requires a financing statement to be filed with the Delaware Department of State. Agent argues next that even if Producers and Intervenors have a PMSI in inventory, that PMSI is limited to the inventory itself and identifiable cash proceeds but does not extend to accounts receivable. *See* Tex. Bus. & Com. Code Ann. § 3.324(b).

Agent asserts that it has a first lien on Debtor's deposit account located at JPMorgan Chase in New York because it has properly perfected its security interest through control. *See* N.Y. U.C.C. § 9-312(b)(1) (McKinney 2019). Specifically, Agent asserts that its Blocked Account Control Agreement with Debtor and JPMorgan Chase serves as an authenticated record that accomplishes control as required by New York law. *See* N.Y. U.C.C. § 9-314.

Agent also asserts that affirmative defenses raised in the Answers/Counterclaims are meritless because no facts were pled to support the affirmative defenses of estoppel, unclean hands, or waiver that were asserted against the Agent. Finally, Agent contends that Producers' counterclaim for conversion fails as a matter of law.

Agent filed a proof of claim in the bankruptcy case that asserts a secured claim for "money loaned" in the amount of $13,478,557.92.[7] *Proof of Claim of Deutsche Bank Trust Company*

---

[7]On April 10, 2018, the Court entered an order in the bankruptcy case that allowed Debtor to pay Agent the sum of its pre-petition claim, along with post-petition interest and charges, totaling $14,692,556.85. *Order Pursuant to 11 U.S.C. §§ 105(a) and 363(b) Authorizing the Debtor to Pay Certain Secured Claims*, Case No. 18-50085 (ECF No. 457) ("Payment Order"). The Payment Order halted Agent's accrual of post-petition interest on funds due under the Credit Agreement. *See id*. The Payment Order provides that it is subject to disgorgement to the extent that the Court determines that security interests alleged by Producers and Intervenors prime Agent's security interests in accounts receivable, deposit accounts, and inventory. *Id*.

*Americas*, Case No. 18-50085 (Claim No. 226-1). Agent asserts that its claim is oversecured because collateral valued at $27.6 million is available for payment of Agent's claim. Furthermore, Agent argues that it is entitled to post-petition interest and reasonable fees, costs, and charges, including payment of the legal fees and expenses for Agent and Lenders pursuant to 11 U.S.C. § 506(b).

### B. Producers' Contentions

Producers' Response argues that reference to the Conoco Phillips General Provisions in the Producer Agreements did not result in waiver of Producers' ability to assert a security interest in oil, gas, and proceeds thereof because: (1) on its face, the language of the Conoco Phillips General Provisions does not waive any lien as to the proceeds received from sale of oil delivered to Debtor; (2) Producers did not provide warranty representation to any other party than the downstream purchaser; and (3) there was not privity of contract between Producers and Agent, nor between Agent and downstream purchasers.

Producers contend next that they hold an automatically-perfected purchase money security interest ("PMSI") in all oil and gas produced in Texas and sold to Debtors during December 2017, along with proceeds thereof, pursuant to Texas § 9.343. Producers also contend that certain of the Producers sold oil and gas production in Oklahoma during December 2017, and that those Producers hold a first, prior, and automatically perfected lien pursuant to Okla. Stat. Ann. tit. 52, § 549.1 (the "Oklahoma Lien Act"). Producers argue that lien rights automatically arising under Texas § 9.343 and the Oklahoma Lien Act result in a PMSI that primes any security interest held by Agent.

In addition, Producers argue that, to the extent there is a conflict of law, the laws of Texas and Oklahoma control resolution of whether Producers' security interests are superior to Agent's

12

UCC Article 9 security interests. Producers contend that the Court should use Restatement (Second) Conflict of Laws § 251(1) and federal common law to evaluate choice-of-law issues on a "case-by-case basis with deference to the state that has the most significant contacts and relationships over the affairs of [Debtor.]" *Producers' Response*, p. 11 (ECF No. 105).

Producers' Response included a list of the proofs of claim filed by individual Producers in Debtor's bankruptcy case, which provided the claim number and the amount of claim asserted. *Producers' Response*, Ex. A (ECF No. 105).

### C. Intervenors' Contentions

Intervenors assert that they also hold an automatically-perfected PMSI in all oil and gas sold to Debtor during December 2017, along with proceeds thereof, pursuant to Texas § 9.343. Intervenors further argue that conflict-of-law provisions found in title 6, section 9-301 of the Delaware Code ("Delaware § 9-301") and section 9.301 of the Texas Business and Commerce Code ("Texas § 9.301") are inapplicable because the language of section 9.343(p) of the Texas Business and Commerce Code provides that "[t]he rights of any person claiming a security interest or lien created by this section are governed by the other provisions of this chapter *except to the extent that this section necessarily displaces those provisions*." (emphasis added).

Additionally, Intervenors argue that Agent waived the ability to claim that Texas § 9.343 did not create a lien in favor of Producers and Intervenors because: (1) terms of the Credit Agreement between Agent and Debtor noted that "First Purchaser Liens" under Texas § 9.343 would be eliminated from Debtor's borrowing base, and (2) the Credit Agreement expressly permitted a lien arising under Texas § 9.343 to exist on Debtor's property, assets, or revenues. Intervenors also contend that estoppel by deed and estoppel by record preclude Agent from taking a position contrary to terms found in the Credit Agreement. Finally, Intervenors argue that Agent

has introduced no evidence showing that Debtor's purchase of product from Intervenors was subject to the Conoco Phillips General Provisions.

RADCO asserts that, as of the Petition Date, Debtor owed $292,513.27 for oil sold to Debtor under the RADCO Purchase Agreement. *Intervenors Response*, ECF No. 103. RHEACO asserts that it is owed $292,519.27 for oil sold to Debtor pre-petition and $18,562.66 in royalty payments for the same products sold to Debtor. *Id*. Radley Corporation, an affiliate of RADCO, alleges that Debtor owes $6,977.38 in royalties for products it sold to Debtor. *Id*.

## LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Bankruptcy Rule 7056 applies Rule 56(c) of the Federal Rules of Civil Procedure to adversary proceedings. If summary judgment is appropriate, the Court may resolve the case as a matter of law.  *Celotex Corp.*, 477 U.S. at 323; *Blackwell v. Barton*, 34 F.3d 298, 301 (5th Cir. 1994). The Fifth Circuit has stated "[t]he standard of review is not merely whether there is a sufficient factual dispute to permit the case to go forward, but whether a rational trier of fact could find for the non-moving party based upon evidence before the court." *James v. Sadler*, 909 F.2d 834, 837 (5th Cir. 1990) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

To the extent that the non-moving party asserts the existence of factual disputes, the evidence offered by the non-moving party to support those factual contentions must be of sufficient quality so that a rational fact finder might, at trial, find in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986) ("[a]dverse party's response . . . must set

forth specific facts showing that there is a genuine issue for trial."). If the record "taken as a whole, could not lead a rational trier of fact to find for the non-moving party, then there is no genuine issue for trial." *LeMaire v. Louisiana*, 480 F.3d 383, 390 (5th Cir. 2007).

In determining whether a genuine issue of material fact exists, the nonmoving party must respond to a proper motion for summary judgment with specific facts demonstrating that such genuine issue exists. "[A] genuine issue of material fact is not raised by mere conclusory allegations or bald assertions unsupported by specific facts." *Leon Chocron Publicidad Y Editoria, S.A. v. Jimmy Swaggart Ministries*, 990 F.2d 1253 (5th Cir. 1993) (citation omitted). The Court must view all evidence in the light most favorable to the non-moving party. *Crawford v. Formosa Plastics Corp. La.*, 234 F.3d 899, 902 (5th Cir. 2000). If summary judgment is appropriate, the Court may resolve the case as a matter of law. *Celotex Corp.*, 477 U.S. at 323.

### IN RE SEMCRUDE, L.P.

In 2009, the Delaware Bankruptcy Court issued its opinion in *Arrow Oil & Gas, Inc. v. SemCrude, L.P. (In re SemCrude, L.P.)*, 407 B.R. 112 (Bankr. D. Del. 2009). The debtors in *SemCrude*, purchased various energy products from producers, including oil and gas, and then resold those products to other entities. *Id*. at 119. In the months before filing for bankruptcy, the debtors purchased oil and gas from producers located in Texas. *Id*. at 122. The debtors sold the oil and gas from the Texas producers to downstream purchasers but failed to remit payment to the Texas producers before filing for chapter 11 bankruptcy. *Id*. The Texas producers alleged that they held automatically perfected PMSIs in all oil and gas sold to the debtors and any resulting proceeds under Texas § 9.343. *Id*. at 124. Meanwhile, a pre-petition lender asserted that it held secured claims against the debtors, and that perfection and priority of security interests claimed by the Texas producers were not governed by Texas § 9.343. *Id*. The lender argued that, pursuant to the

law governing perfection and priority of security interests found in Article 9 of the UCC, the debtors' places of incorporation[8] determined perfection and priority of security interests alleged by the Texas producers and lender. *Id*. The lender contended that if the Texas producers did not perfect their security interests in oil, gas, and proceeds thereof based on the UCC requirements of the state where the debtors were incorporated, then the Texas producers had unperfected security interests subordinate to the lender's security interests.[9] *Id*.

The court held, in relevant part, that Delaware's choice of law rules regarding perfection and priority of security interests governed. *Id*. at 130. Relying on § 9-301 of the UCC, which is the same in Delaware and Texas, the court determined that the law of the location of the debtor determined perfection of the producer's security interests in oil, gas, proceeds thereof, and accounts receivable. *Id*. at 133–34. Because the debtors were incorporated in Delaware and Oklahoma, the laws of those states (depending on where the debtor incorporated) applied when determining perfection and priority of UCC security interests alleged by the Texas producers and the lender. *Id*. at 132–38. To establish perfection of claimed security interests, the Texas producers and the lender were required to properly file a financing statement in the appropriate state. *Id*. 137–38. As of the date of this Memorandum Opinion, the ***SemCrude*** opinion is the sole opinion analyzing whether Texas § 9.343 applies in disputes regarding perfection and priority among lenders and Texas producers of oil and gas when the debtor is incorporated outside of Texas.

## LEGAL ANALYSIS

### A.  Conoco Phillips General Provisions and Contractual Waiver Language

---

[8] In ***SemCrude***, the debtors were incorporated in Delaware and Oklahoma. ***SemCrude***, 407 B.R. at 122.

[9] The lenders also argued, in the alternative, that "even if Texas law governed perfection of Texas producers' security interests, Texas law limits Texas [p]roducers' special PMSI priority arising pursuant to Texas § 9.343 to (i) the remaining oil and gas inventory of [d]ebtors as of [the petition date] and (ii) any proceeds from the sale of such oil and gas that [d]ebtors received on or before delivery of Texas [p]roduct." ***SemCrude***, 407 B.R. at 124. In the present case, Agent made the same argument. Because the Court finds that Texas § 9.343 does not apply, the Court does not provide its decision regarding this argument.

As an initial matter, Agent argues that, regardless of lien perfection and priority issues, Producers cannot assert a security interest in Debtor's goods, inventory, accounts, proceeds, and deposit accounts under Texas § 9.343 because the Conoco Phillips General Provisions that are incorporated by reference into certain of the Producer Agreements provide for express waiver of Producers' liens. The Producer Agreements, which are contracts between Debtor and certain of the Producers,[10] include the following language:

> **Special Provisions**: Conoco Phillips General Provisions dated 1993 and subsequent amendments dated 2009 are made a part of this contract by reference hereto. However, the terms herein shall control if there is any conflict between these terms and those in the General Provisions.

The Conoco Phillips General Provisions include several provisions, including the following:

> **Warranty:** The Seller warrants good title to all crude oil delivered hereunder and warrants that such crude oil should be free from all royalties, liens, encumbrances, and applicable foreign, federal, state and local taxes.

Agent asserts that the Delaware Bankruptcy Court in **SemCrude** determined that producers of oil and gas who entered into contracts containing Conoco Phillips General Provisions waived any lien that could have arisen under Texas § 9.343. To support its argument, Agent cites to two cases: **New Dominion, LLC v. J. Aron & Co. (In re SemCrude, L.P.)**, No. 08-11525, 2018 WL 481862 (Bankr. D. Del. Jan. 17, 2018) and **J. Aron & Co. v. SemCrude, L.P. (In re SemCrude, L.P.)**, 504 B.R. 39 (Bankr. D. Del. 2013).

In **New Dominion, LLC v. J. Aron & Co. (In re SemCrude, L.P.)**, upstream producer New Dominion, LLC ("ND") sold oil to SemCrude, a midstream service provider. 2018 WL 481862 at *1. SemCrude then sold oil to third-party downstream purchasers, including J. Aron & Company ("J. Aron"). **Id**. After SemCrude filed for bankruptcy, ND and other upstream producers were

---

[10]Agent was unable to demonstrate that Debtor had a producer agreement with the following Producers and Intervenors: Jerry C. Dewbre, Trustee; Energy Reserves Group, LLC; RADCO; and RHEACO. *Agent's App'x*, Pt. 16 (ECF No. 90-15).

owed millions of dollars for oil and gas delivered to SemCrude pre-petition. *Id*. To recover unpaid funds for oil and gas sold to SemCrude, ND, an Oklahoma-based company, filed liens under Okla. Stat. Ann. tit. 52, §§ 548.1—548.6.[11] *Id*. ND then filed suit against J. Aron to foreclose on the alleged statutory liens. *Id*. at *2. J. Aron contended that ND could not assert lien rights against its proceeds from sales of oil because: (1) ND sold oil to SemCrude under an express warranty, and (2) SemCrude sold oil to J. Aron under an identical express warranty. *Id*. at *3. J. Aron also argued that ND could not demonstrate that J. Aron ever received any of ND's oil from SemCrude. *Id*. The Delaware Bankruptcy Court held that ND, an upstream producer, waived its right to assert a lien in its oil against J. Aron, a downstream purchaser, when the oil was sold under the warranty provided by the Conoco Phillips General Provisions. *Id*. at *4.

In *J. Aron & Co. v. SemCrude, L.P. (In re SemCrude, L.P.)*, the Delaware Bankruptcy Court held that downstream purchaser J. Aron purchased oil and gas from midstream producer SemCrude free and clear of any liens of upstream producers who originally sold the product to SemCrude because the downstream purchasers were both "buyers for value" under UCC § 9-317 and "buyers in the ordinary course" under UCC § 9-320. 504 B.R. at 43, *aff'd*, 864 F.3d 280 (3d Cir. 2017). In dicta, the Delaware Bankruptcy Court noted that the Conoco Phillips General Provisions incorporated in the contracts between SemCrude and the downstream purchasers served as an "express [warranty] that the product was not subject to any security interests." *Id*. at 60.

Producers contend that the Conoco Phillips General Provisions in certain of the Producer Agreements with Debtor are nothing more than a warranty to purchasers that oil in the hands of

---

[11] In 2008, when the oil and gas transactions between ND, SemCrude, J. Aron occurred, title 52, section 548 of the Oklahoma Statutes & Court Rules granted producers a "lien upon the oil or gas severed [from [their] wells], or the proceeds of sale if such oil or gas [had] been sold, to the extent of [their] interest" until full payment was received. Okla. Stat. Ann. tit. 52, § 548.2 (2008) (repealed 2010). Title 52, section 548 of the Oklahoma Statutes & Court Rules was repealed and replaced by the Oklahoma Lien Act, which became effective on April 19, 2010. *See* Okla. Stat. Ann. tit. 52, § 549.3.

the purchasers is not subject to the Producers' liens. Next, Producers argue that even if the Conoco Phillips General Provisions in certain of the Producer Agreements serve as a warranty preventing Producers from asserting a lien to secure the purchase price of the oil and gas, then Producers could still assert a lien as to the *proceeds* received from the sale of the oil delivered to Debtor. Producers also argue that the Conoco Phillips General Provisions provided a warranty only to downstream purchasers, not to Agent or Lenders. (emphasis added). Finally, Producers assert that there is no privity between Producers and Agent, nor between Agent and downstream purchasers.

Intervenor argues that Agent failed to produce evidence showing that Debtor's purchase of product from Intervenors was subject to the Conoco Phillips General Provisions. Intervenors state that the RADCO Purchase Agreement does not contain any of the language cited by Agent that results in the alleged waiver of claims. In Agents' Reply, Agent asserts that while the RADCO Agreement does not contain a reference to the Conoco Phillips General Provisions, it contains clear waiver language:

> 5. Warranty of Title and Authority to Sell. Seller [RADCO] **hereby warrants and guarantees that the title to the portion of the crude oil sold and delivered hereunder which is owned by Seller is free and clear of all liens and encumbrances** and warrants that as to the remaining portion of the crude oil sold and delivered hereunder Seller has the right and authority to sell and deliver said crude oil for the benefit of the true owners thereof.

*Agent's Reply to Response*, p. 15 (ECF No. 109) (emphasis in original). According to Agent, this language waives Intervenors' ability to assert security interests in Debtor's goods, inventory, accounts proceeds, and deposit accounts.

The Court finds that incorporation of the Conoco Phillips General Provisions in certain of the Producer Agreements did not cause Producers to waive their ability to assert a lien or security interest in oil and gas and proceeds thereof under Texas § 9.343. Likewise, the Court finds that the warranty language in the RADCO Agreement did not serve as a waiver. Contrary to Agent's

19

assertions, the Delaware Bankruptcy Court's findings in ***New Dominion, LLC v. J. Aron & Co.*** and ***J. Aron & Co. v. SemCrude, L.P.*** are inapposite on the issue of whether the incorporation of the Conoco Phillips General Provisions in certain Producer Agreements serves as a waiver of certain Producers' rights to assert a lien in oil and gas and proceeds thereof under Texas § 9.343.

> ***New Dominion, LLC v. J. Aron & Co.*** and ***J. Aron & Co. v. SemCrude, L.P.*** are factually distinct from the facts in the present case in that they address the relevant rights between an upstream producer and downstream purchaser as it relates to oil and gas sold to and by a midstream producer. In the present matter, the Court is assessing the relative rights between a lender and an upstream producer as it relates to oil and gas sold by Debtor, a midstream provider. Stated differently, in ***New Dominion, LLC v. J. Aron & Co.*** and ***J. Aron & Co. v. SemCrude, L.P.***, the upstream producers were seeking to enforce their rights against the downstream purchaser; here, Agent is seeking to enforce its rights against an upstream producer. Therefore, the Court concludes that the Conoco Phillips General Provisions do not cause Producers and Intervenors to waive their rights to assert a lien under Texas § 9.343.

B. <u>Conflict of Law Dispute Between Agent, Producers, and Intervenors Regarding Perfection and Priority of Security Interests in Goods, Inventory, Accounts, Proceeds and Deposit Accounts</u>

> Agent's next argument is that conflict of law issues exist in the present matter. Agent assets that conflict of law disputes should be resolved through application of the Restatement (Second) of the Law Conflict of Laws (hereinafter "Restatement"). Agent asserts that § 6(1) of the Restatement requires the Court to apply UCC § 9-301, which is the same in Delaware and Texas, to determine priority and perfection of security interests being alleged in Debtor's goods,

inventory, accounts, and proceeds. Under UCC § 9-301, "while a debtor is located in a jurisdiction, the local law of that jurisdiction governs perfection, the effect of perfection or nonperfection, and the priority of a security interest in collateral." Del. Code Ann. tit. 6, § 9-301(1); Tex. Bus. & Com. Code Ann. § 9.301(1). Agent argues that because Debtor is organized under the laws of Delaware, Delaware law governs perfection. In Delaware, perfection of a security interest in goods, inventory, accounts, and proceeds arises by filing a UCC-1 financing statement with the Delaware Department of State. Del. Code Ann. tit. 6, § 9-310(a). Because Agent was the first to file UCC-1 financing statements in Delaware on substantially all of Debtor's collateral, Agent contends that its security interest primes liens asserted by Producers and Intervenors.

In response, Producers and Intervenors argue that they have an automatically arising PMSI in Debtor's oil, gas and proceeds thereof for oil produced in Texas under the plain language of Texas § 9.343. Producers and Intervenors argue that section 9.343(p) of the Texas Business and Commerce Code[12] prevents Agent from relying on UCC § 9-301 to determine the law governing perfection and priority of security interests held by Producers in Texas. Producers also contend that they have a first, prior and automatically perfected lien in Debtor's oil, gas, and proceeds thereof for oil produced in Oklahoma under the Oklahoma Lien Act.

Producers argue that to the extent there is a conflict of law, the Courts are not in complete agreement with addressing conflicts of law in bankruptcy. Citing to ***Vanston Bondholders Prot. Comm. v. Green***, 30 F.3d 1578, 1581–82 (1946), Producers propose that the Court use a federal independent judgment test to evaluate choice of law issues on a case-by-case basis with deference to the state that has the most significant contacts and relationships over the affairs of Debtor.

---

[12] Section 9.343(p) of the Texas Business and Commerce Code provides that "[t]he rights of any person claiming a security interest or lien created by this section are governed by the other provisions of this chapter except to the extent that this section necessarily displaces those provisions."

Producers also advocate that the Court must apply Restatement § 251(1) to assess the "local law of the state that has the most significant relationship to the parties, the chattel, and the security interest" to make its determination on the validity and extent of its security interest in oil, gas, and proceeds thereof.

In the present dispute, the Court must determine: (1) which state law(s) govern perfection of security interests, and (2) if the security interests are properly perfected, priority among the perfected security interests.  An overview of each relevant state's law is provided below.

### 1.  Texas Business & Commerce Code

Producers and Intervenors argue that, to the extent they produced oil and gas in Texas and sold oil to Debtor in Texas, their security interests in Debtor's oil, gas and proceeds thereof arise under Texas § 9.343 and result in a PMSI that primes any security interests held by Agent. Texas § 9.343, which is a non-uniform amendment to Texas's version of the UCC states in part:

> This section provides a security interest in favor of interest owners, as secured parties, to secure the obligations of the first purchaser of oil and gas production, as debtor, to pay the purchase price. An authenticated record giving the interest owner a right under real property law operates as a security agreement created under this chapter. The act of the first purchaser in signing an agreement to purchase oil or gas production, in issuing a division order, or in making any other voluntary communication to the interest owner or any governmental agency recognizing the interest owner's right operates as an authentication of a security agreement in accordance with Section 9.203(b) for purposes of this chapter.

Tex. Bus. & Com. Code Ann. § 9.343(a). An "interest owner" is defined as a "person owning an entire or fractional interest of any kind or nature in oil or gas production at the time of severance, or a person who has an express, implied, or constructive right to receive a monetary payment determined by the value of oil or gas production or by the amount of production." Tex. Bus. & Com. Code Ann. § 9.343(r)(2). A "first purchaser" is defined, in relevant part, as "the first person that purchases oil or gas production from an operator or interest owner after the production is

severed." Tex. Bus. & Com. Code Ann. § 9.343(r)(3). An "operator" is a "person engaged in the business of severing oil or gas production from the ground, whether for the person alone, only for other persons, or for the person and others." Tex. Bus. & Com. Code Ann. § 9.343(r)(4).

Texas § 9.343 gives rise to a "security interest" that is "perfected automatically without the filing of a financing statement." Tex. Bus. & Com. Code Ann. § 9.343(b). Automatic perfection occurs "if the interest of the secured party is evidenced by a deed, mineral deed, reservation in either, oil or gas lease, assignment or any other such record recorded in the real property records of a county clerk, that record is effective as a filed financing statement for the purposes of this chapter." *Id*. Moreover, section 9.343(d) of the Texas Business and Commerce Code creates a "lien that secures the rights of any person who would be entitled to a security interest under [section 9.343(a)] except for lack of any adoption of a security agreement by the first purchaser or lack of possession or record required by [section 9.203] for the security interest to be enforceable." Tex. Bus. & Comm. Code Ann. § 9.343(d).

The "security interest" that arises in favor of interest owners under Texas § 9.343 exists in: (i) oil and gas production in the possession of the first purchaser, and (ii) identifiable proceeds of that production owned by, received by, or due to the first purchaser. Tex. Bus. & Com. Code Ann. § 9.343(c)(1). Interest owners' security interests in identifiable proceeds exist for "an unlimited time if: (A) the proceeds are oil or gas production, inventory of raw, refined, or manufactured oil or gas production . . . ; (B) the proceeds are accounts, chattel paper, instruments, documents, or payment intangibles; or (C) the proceeds are cash proceeds, as defined in [section 9.102] . . . ." Tex. Bus. & Com. Code Ann. § 9.343(c)(1)(A). Security interests created by Texas § 9.343 have the following priorities over other Chapter 9 security interests:

> (1) A security interest created by this section is treated as a purchase-money security interest for purposes of determining its relative priority under Section

23

9.324[13] over other security interests not provided for by this section. A holder of a security interest created under this section is not required to give the written notice every five years as provided in Section 9.324(b)(3) to have purchase-money priority over a security interest with a prior financing statement covering inventory.

(2) A statutory lien is subordinate to all other perfected Chapter 9 security interests and has priority over unperfected Chapter 9 security interests and the lien creditors, buyers, and transferees mentioned in Section 9.317.

Tex. Bus. & Com. Code Ann. § 9.343(f).

On the issue of priority, section 9.322 of the Texas Business and Commerce Code states, "[c]onflicting perfected security interests . . . rank according to priority in time of filing or perfection. Priority dates from the earlier of the time of a filing covering the collateral is first made or the security interest is . . . first perfected. " Tex. Bus. &. Com. Code Ann. § 9.322(a)(1).

### 2. Oklahoma Law

Oklahoma Producers argue that to the extent oil and gas was produced in Oklahoma and sold to Debtor in December 2017, Oklahoma Producers are entitled to a statutory lien in Debtor's oil, gas, and proceeds thereof that takes priority over any other lien, whether arising by contract, law, equity, or otherwise. The Oklahoma Lien Act[14] is a statutory lien provision that arises under Oklahoma state law. "To secure the obligations of a first purchaser[15] to pay the sales price, each interest owner[16] is granted an oil and gas lien to the extent of the interest owner's interest in oil and gas rights." Okla. Stat. Ann. tit. 52, § 549.3. "Oil and gas rights" are defined in the Oil and Gas Owners' Lien Act of 2010 as follows:

---

[13] Section 9.324(a) of the Texas Business and Commerce Code addresses priority of PMSIs.

[14] The Oil and Gas Owners' Lien Act of 2010 repealed and replaced the Oil and Gas Owners' Lien Act of 1988. *See* 52 Okla. Stat. § 549.1 cmts. 1–3.

[15] A "first purchaser" is the "first person that purchases oil or gas from an interest owner, either directly or through a representative, under an agreement to sell." Okla. Stat. Ann. tit. 52, § 549.2(4).

[16] An "interest owner" is a "person owning an interest of any kind or nature in oil and gas rights before the acquisition thereof by a first purchaser. Interest owner includes a representative and a transferee interest owner." Okla. Stat. Ann. tit. 52, § 549.2(6).

9. a. "Oil and gas rights" means, as to any lands within the State of Oklahoma, any right, title or interest, whether legal or equitable, in and to:

(1) oil,
(2) gas,
(3) proceeds,
(4) an oil and gas lease,
(5) a pooling order, and
(6) an agreement to sell.

b. By way of illustration and not limitation, oil and gas rights include, but are not limited to:

(1) oil or gas in place prior to severance,
(2) oil or gas production, or the right to receive a portion of the proceeds, upon severance,
(3) any interest or estate in, by, through or under an oil and gas lease,
(4) rights acquired under a pooling order insofar as such rights relate to: ownership of oil and gas, the right to proceeds, or the right to enter into an agreement to sell,
(5) a legal or equitable right to receive consideration of whatsoever nature under an agreement to sell, or
(6) a mortgage lien or security interest in any of the foregoing;

Okla. Stat. Ann. tit. 52, § 549.2. An oil and gas lien "exists in and attaches immediately to all oil and gas on the effective date of this act; continues uninterrupted and without lapse in all oil and gas upon severance; and continues uninterrupted and without lapse in and to all proceeds." Okla. Stat. Ann. tit. 52, § 549.3. Moreover, "an oil and gas lien exists until the interest owner or representative first entitled to receive the sales price has received the sales price. *Id*. In Oklahoma, an oil and gas lien "exists as part of and incident to the ownership of oil and gas rights and is perfected automatically without the need to file a financing statement or any other type of documentation." Okla. Stat. Ann. tit. 52, § 549.4. "Except for a permitted lien,[17] an oil and gas lien is a lien that takes priority over any other lien, whether arising by contract, law, equity or otherwise,

---

[17] A "permitted lien" includes "a mortgage lien or security interest granted by a first purchaser in favor of a person not an affiliate of the first purchaser which mortgage lien or security interest secures payment under a written instrument of indebtedness signed by the first purchaser and accepted in writing by payee thereof *prior to the effective date of this act"* and "a validly perfected and enforceable lien created by statute, rule, or regulation of a governmental agency for storage or transportation charges." Okla. Stat. Ann. tit. 52 § 549.2(11) (emphasis added).

or any security interest." Okla. Stat. Ann. tit. 52, § 549.7. Comment 1 title 52, section 549.7 of the Oklahoma Statutes & Court Rules states that "an interest owner's oil and gas lien takes priority over any other lien or any security interest . . . [creating] an automatic super-priority without any public notice by a filing or possession." Okla. Stat. Ann. tit. 52 § 549.7 cmt. 1.

### 3. Delaware Law

Agent argues that, pursuant to Delaware § 9-301, Delaware law applies to determine perfection and priority of security interests in Debtor's goods, inventory, accounts, and proceeds. Unlike in Texas, Delaware's version of UCC Article 9 does not contain a non-standard provision providing for automatic perfection of a security interest to producers of oil and gas. Likewise, Delaware's version of UCC Article 9 does not contain any statutory lien provisions similar to those arising under the Oklahoma Lien Act that determine the lien rights of producers of oil and gas.

Agent also argues that, pursuant to Delaware § 9-304(a), New York law applies to determine perfection and priority of security interests in Debtor's deposit accounts.

### a. *Perfection of Goods, Inventory, Accounts, Proceeds*

Under Delaware law, perfection of a security interest in inventory, accounts, and proceeds is achieved by filing a financing statement with the Delaware Department of State. *See* Del. Code Ann. tit. 6, § 9-310(a) (providing that "a financing statement must be filed to perfect all security interests" except otherwise stated in the exceptions, which are not relevant here); *see also* Del. Code Ann. tit. 6, § 9-501 (providing that if Delaware law governs perfection of a security interest, "the office in which to file a financing statement to perfect the security interest is . . . the office of the Secretary of State). A perfected security interest in collateral attaches to "any identifiable proceeds of collateral" and "is a perfected security interest if the interest in the original collateral

was perfected." Del. Code Ann. tit. 6, §§ 9-315(a)(2), (c). Delaware follows the first-to-file-or-perfect rule, meaning that "conflicting perfected security interests . . . rank according to priority in time of filing or perfection." Del. Code Ann. tit. 6, § 9-322(a)(1). "Priority dates from the earlier of the time a filing covering the collateral is first made or the security interest . . . is first perfected." *Id*.

### b. *Perfection of Deposit Accounts*

Delaware law provides that perfection, the effect of perfection, and priority of a security interest in a deposit account is governed by local law of the bank's jurisdiction. Del. Code Ann. tit. 6, § 9-304(a). Agent argues that its security interest in Debtor's deposit accounts was perfected by control. A bank's jurisdiction is determined by "an agreement between the bank and its customer governing the deposit account [that] expressly provides that the agreement is governed by the law of a particular jurisdiction." Del. Code Ann. tit. 6, § 9-304(b)(1). If an agreement does not expressly provide that that the agreement is governed by the law of a particular jurisdiction, then the law governing perfection is based on "an agreement between the bank and its customer governing the deposit account [that] expressly provides that the agreement is governed by the law of a particular jurisdiction." Del. Code Ann. tit. 6, § 9-304(b)(2).

### 4. Conflict of Law Between Agent and Oklahoma Producers

Producers who produced oil and gas in Oklahoma and sold it to Debtor (hereinafter referred to as "Oklahoma Producers") argue that the Oklahoma Lien Act causes them to have a first, prior and automatically perfected lien in Debtor's oil and gas and proceeds thereof based on amounts due for oil produced in Oklahoma and sold to Debtor. The Declaration of Deborah Kryak notes that "less than $1 million of oil produced and delivered in Oklahoma was purchased by Debtor in December 2017" and that "the Oklahoma oil was primarily delivered to customers in

Oklahoma." *Agent's App'x*, Pt. 16 (ECF No. 90-15).

The Oklahoma Lien Act states that an "oil and gas lien" exists "to the extent of the owner's interest in oil and gas rights . . . and shall exist as part of and incident to the ownership of oil and gas rights." Okla. Stat. Ann. tit. 52, § 549.3(A). Comment 2 to title 52, section 549.3(A) of the Oklahoma Statutes & Court Rules provides that the Oklahoma Lien Act "makes it clear that the interest owner's oil and gas lien created by the Lien Act is not a UCC Article 9 security interest but rather arises as part of a real estate interest of the interest owner in the materials." Okla. Stat. Ann. tit. 52, § 549.3(A), cmt. a. Moreover, comment a notes that "the governing law is the law of the state where the well is located. . . [to avoid] application of the UCC Article 9 choice of law rules for personal property." *Id*. (citations omitted). The Oklahoma Lien Act also provides that no interest owner shall be "required, as a condition or term of an agreement to sell or otherwise, . . . to agree to any provision that would apply the law of any state other than the State of Oklahoma insofar as the same relates to rights under this act, and any such purported waiver . . . shall be void as a matter of public policy in this state." Okla. Stat. Ann. tit. 52, § 549.9.

Under the Oklahoma Lien Act, an interest owner's lien "exists in and attaches immediately to all oil and gas on the effective date of this act." Okla. Stat. Ann. tit. 52, § 549.3(B)(1). An interest owner's lien also "continues uninterrupted and without lapse in all oil and gas upon and after severance" and "continues uninterrupted and without lapse in and to all proceeds." Okla. Stat. Ann. tit. 52, §§ 549.3(B)(2), (3). The Oklahoma Lien Act provides that an oil and gas lien "takes priority over any other lien, whether arising by contract, law, equity, or otherwise, or any security interest." Okla. Stat. Ann. tit. 52, § 549.7. Rights granted to interest owners under the Oklahoma Lien Act "are to be liberally construed" to "afford the interest owner the most comprehensive protection" to receive the sales price from a purchaser. Okla. Stat. Ann. tit. 52, § 549.12(A).

As of the date of this Opinion, the Court is unaware of an opinion by any court that interprets and applies the Oklahoma Lien Act to determine lien perfection and priority among a pool of competing creditors that includes producers of oil and gas in Oklahoma.[18] In ***Gaskins v. Texon, LP***, the Oklahoma Court of Appeals analyzed whether a downstream purchaser had a duty under Oklahoma's Production Revenue Standards Act to hold revenue or proceeds in an implied trust for the benefit of the legal owner. 321 P.3d 985, 987 (Okla. Civ. App. 2013). The ***Gaskins*** court noted in dicta that the Oklahoma Legislature repealed the existing Lien Act of 1988 and enacted Oklahoma Lien Act in 2010 "in response to the [***SemCrude***] litigation." ***Id***. at 990 (citing Okla. Stat. Ann. tit. 52, § 549.1, cmt. 10) (noting that the Oklahoma Lien Act was "designed to remedy some of the deficiencies perceived to be present in the [p]rior [a]ct as well as to address some of the issues that emerged in the SemGroup litigation"). The ***Gaskins*** court provided "the purpose of the statute was to give Oklahoma producers and royalty owners a first-priority lien to secure payment for their interest in oil and gas sold to a first purchaser." ***Id***. The ***Gaskins*** court further stated:

> [the Oklahoma Lien Act] strengthens the rights of Oklahoma interests owners in three (3) ways: (1) Oklahoma oil and gas interests are now governed by real property law, which designates the applicable law by the state in which the wellhead is located; (2) Oklahoma interest owners can now obtain a lien that will remain attached until a first purchaser has paid in full the purchase price of produced oil; and (3) the Lien Act explicitly and unbendingly grants superior priority to Oklahoma interest owners above all other lienholders and U.C.C. Article 9 secured creditors.

***Id***. at 991 (citing *There's A New Act in Town: How the Oklahoma Oil and Gas Owners' Lien Act of 2010 Strengthens the Position of Oklahoma Interest Owners*, 65 Okla. L.Rev. 133 (2012)).

---

[18] In ***Baker Farms Energy, Inc. v. Sandridge E & P, LLC (In re Sandridge Energy, Inc.)***, a class of royalty owners filed an adversary proceeding seeking declaratory relief as to whether they were entitled to commence an action asserting remedies from debtors arising from alleged underpayment of royalties under oil and gas leases in Oklahoma and Kansas. Case No. 16-32488, 2018 WL 889357 at *1 (Bankr. S.D. Tex. Feb. 5, 2018). In relevant part, royalty owners relied on the Oklahoma Lien Act to assert that they held a secured claim against debtors. ***Id***. at *11. Questions of law posed by royalty owners did not go to the merits of their claim, but rather as to whether they could pursue a claim against debtor outside of bankruptcy. ***Id***. As such, the court did not make a determination of law based on application of the Oklahoma Lien Act. ***Id***.

The Court notes that Oklahoma Producers did not provide evidence demonstrating their interest in "oil and gas rights." *See* Okla. Stat. Ann. tit. 52, § 549.2(9). To the extent Oklahoma Producers can demonstrate that they have "oil and gas rights" subject to an oil and gas lien under the Oklahoma Lien Act, the Court finds that Oklahoma law applies to determine the perfection and priority of Oklahoma Producers' interests in oil, gas, and proceeds thereof for oil produced in Oklahoma and sold to Debtors in December 2017. *See* Okla. Stat. Ann. tit. 52, § 549.3. As such, the Court denies Agent's summary judgment as to Oklahoma Producers.

### 5. Conflict of Law Between Agent, Texas Producers, and Intervenors

Next, the parties contend that the Court must determine the law that governs perfection and priority of security interests in Debtor's accounts receivable, inventory, proceeds, and deposit accounts among Agent, Texas Producers, and Intervenors. Agent argues that UCC § 9-301, which is the same in Delaware as in Texas, determines perfection and priority. Texas Producers and Intervenors contend that Texas § 9.343, a non-standard provision incorporated into the Texas Business & Commerce Code's adoption of the UCC, determines perfection and priority. The Delaware Code does not contain a non-standard provision similar to Texas § 9.343.

When a conflict of law issue arises in a bankruptcy case, the Court is faced with the unsettled question of which choice-of-law rules should be applied. *See Tow v. Rafizadeh (In re Cyrus II Partnership)*, 413 B.R. 609, 613 (Bankr. S.D. Tex. 2008). Traditionally, federal courts with diversity jurisdiction apply the "forum state's conflicts-of-law rules to determine what law governs state-law claims." *Bailey v. Shell W. E&P, Inc.*, 609 F.3d 710, 722 (5th Cir. 2010) (citing *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). Bankruptcy courts, however, "sit in federal question jurisdiction and not diversity jurisdiction" and thus are not bound by the Supreme Court's determination in *Klaxon* that the forum state's conflict-of-law rules apply. *See Tow*, 413

30

B.R. at 613. The Bankruptcy Code does not provide a method for resolving conflicts of law. *Fishback Nursery, Inc. v. PNC Bank, N.A.*, Case No. 3-16-CV-03267, 2017 WL 6497802 at *3 (N.D. Tex. Dec. 19, 2017).

Texas Producers argue that, to the extent there is a conflict of law, the Court should apply the federal independent judgment test expressed in *Vanston Bondholders Protective Comm. v. Green*, 329 U.S. 156 (1946). Specifically, Texas Producers urge the Court to look to Restatement §§ 6(2) and 251(1) to evaluate choice of law issues on a case-by-case basis with deference to the state that has the most significant contacts and relationships over the affairs of Debtor. *Producers' Response*, p. 11 (ECF No. 105) (citing *Vanston*, 329 U.S. at 162). Restatement § 251 states:

> (1) The validity and effect of a security interest in a chattel as between the immediate parties are determined by the local law of the state which, with respect to the particular issue, has the most significant relationship to the parties, the chattel and the security interest under the principles stated in § 6.

> (2) In the absence of an effective choice of law by the parties, greater weight will usually be given to the location of the chattel at the time that the security interest attached than to any other contact in determining the state of the applicable law.

Restatement (Second) Conflict of Laws § 251(1). Texas Producers also cite to comment e of Restatement § 251(1), which provides that "greater weight will be given to the location of the chattel, or group of chattels, at the time the security interest attached than to any other contact." *Id*. Texas Producers argue that Texas law should apply because their security interests are created by state law and granted in oil and gas located and produced in Texas.

Agent argues that in determining how to resolve conflicts of law, the Court should apply the Restatement because both Delaware and Texas resolve choice-of-law issues through an analysis under the Restatement. *See Travelers Indem. Co. v. Lake*, 594 A.2d 38, 46–47 (Del. 1991); *see also Reddy Ice Corp. v. Travelers Lloyds Ins. Co.*, 145 S.W .2d 337, 340 (Tex. App.— Houston 2004, no pet.). Agent contends that Restatement § 6(1) is the applicable Restatement

provision to determine the issues here. The Court notes that the "most significant relationship" test discussed in Restatement § 251 is guided by the choice-of-law principles stated in Restatement § 6, which provides that:

> (1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.
>
> (2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include
> (a) the needs of the interstate and international systems,
> (b) the relevant policies of the forum,
> (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
> (d) the protection of justified expectations,
> (e) the basic policies underlying the particular field of law,
> (f) certainty, predictability and uniformity of result, and
> (g) ease in the determination and application of the law to be applied.

Restatement (Second) of Conflict of Laws § 6. According to Agent, Restatement § 6(1) Restatement applies because UCC § 9-301, which is the same in Delaware and Texas, is the relevant statutory directive on choice of law that the Court must follow to determine perfection and priority of security interests in goods, inventory, accounts, and proceeds.

The Fifth Circuit has not determined whether bankruptcy courts should exercise federal choice-of-law principles or the forum state's choice-of-law rules. *MC Asset Recovery LLC v. Commerzbank A.G. et al (In re Mirant Corp.)*, 675 F.3d 530, 536 (5th Cir. 2012); *see also Woods-Tucker Leasing Corp. of GA v. Hutcheson-Ingram Dev. Co.*, 642 F.2d 744, 749 (5th Cir. 1981). Moreover, the Fifth Circuit has avoided determining which choice-of-law principles to apply in bankruptcy cases if federal and forum-state choice-of-law rules produce the same result. *Woods-Tucker*, 642 F.2d at 748 (stating that the Supreme Court and the Fifth Circuit have "taken care to avoid resolving [the] question" of whether a bankruptcy court must apply the choice of law rules of the forum state or exercise its independent judgment) (citing *Fahs v. Martin*, 22 F.2d 387, 396–

97 (5th Cir. 1955)). The federal choice-of-law rule consists of the "'independent judgment test,' which is a multi-factor contacts analysis that applies the law of the state with the most significant relationship to the transaction at issue." ***ECN Capital (Aviation) Corp. v. Airbus Helicopters SAS (In re CHC Grp. Ltd.)***, Case No. 16-3151-BJH, 2017 WL 1380514 at \*19 (Bankr. N.D. Tex. Mar. 28, 2017); *citing **MC Asset Recovery***, 675 F.3d at 536. Meanwhile, the forum state here, Texas, applies the Restatement to decide choice-of-law issues.[19] ***ECN Capital***, 2017 WL 1380514 at \*19.

In the present case, to the extent there is a "threshold question of whether the federal or forum (Texas) law applies," the Court finds that it is not necessary to make that determination. ***Woods-Tucker***, 642 F.2d at 748. Both Texas and Delaware have adopted the UCC, which is regarded as "the federal law of commerce regarding transactions including secured transactions." *Id*. at 749 (citing ***In re King-Porter Company***, 446 F.2d 722, 732 (5th Cir. 1971). As such, the Court looks to the UCC as the relevant law governing perfection and priority of security interests in the collateral at issue here, which is all personal property. *See **Davidson Oil County Supply v. Klockner, Inc.***, 908 F.2d 1238, 1248 (5th Cir. 1990) (stating that because the UCC governed the case, the choice of law provisions contained in the UCC "must be applied").

To "promot[e] certainty and predictability in commercial transactions," Article 9 of the UCC was revised in 2001 to include UCC § 9-301. *See **In re SemCrude***, 407 B.R. at 136 (citing ***Shell Oil v. HRN, Inc.***, 144 S.W .3d 429, 435 (Tex. 2004) (citations omitted)). Texas § 9.301 and Delaware § 9-301 have adopted UCC § 9-301 uniformly. Texas § 9.301 and Delaware § 9-301 both provide that "while a debtor is located in a jurisdiction, the local law of that jurisdiction

---

[19] The Fifth Circuit has not determined which Restatement provision is dispositive in analyzing choice-of-law issues in scenarios where the validity and effect of a security interest is at issue. In ***Fishback Nursery***, an unreported decision issued by the United States District Court for the Northern District of Texas, Dallas Division, the court declined to determine whether federal or forum choice-of-law rules applied, and instead performed an analysis under §§ 6 and 251 of the Restatement. 2017 WL 6497802 at \*5–6.

governs perfection, the effect of perfection or nonperfection, and the priority of a security interest in collateral." Tex. Bus. & Com. Code Ann. § 9.301(1); Del. Code Ann. tit. 6 § 9-301(1). The location of a registered organization is defined in UCC § 9-307(e), which provides "a registered organization that is organized under the law of the state is located in that state." Del. Code Ann. tit. 6 § 9-307(e); Tex. Bus. & Com. Code Ann. § 9.307(e).

Here, the parties do not dispute that the Debtor is organized under the laws of Delaware. As such, regardless of whether Texas § 9.301 or Delaware § 9-301 applies, performing the analysis under each state's law results in the same outcome—because Debtor is organized under the laws of Delaware, Debtor is "located" in Delaware for the purposes of determining perfection of security interests in collateral, including goods, inventory, accounts, and proceeds. Therefore, the Court finds that Delaware's UCC governs perfection, effect of perfection or nonperfection, and the priority of security interest in collateral, which includes goods, inventory, accounts, and proceeds. *See* Del. Code Ann. tit. 6 § 9-301.

Texas Producers and Intervenors contend that Agent's reliance on UCC § 9-301 is misplaced, given that § 9.343(p) of the Texas Business & Commerce Code provides that "[t]he rights of any person claiming a security interest or lien created by [Texas's Article 9] are governed by the other provisions of this chapter *except to the extent that this section necessarily displaces those provisions*." (emphasis added). Intervenors argue that it would be "absurd" if non-Texas entities could rely upon UCC § 9-301 to eliminate all provisions of Texas § 9.343.

When construing any statute, including the UCC, "the statute must be read as a whole." ***In re Condor Ins. Ltd.***, 601 F.3d 319, 321 (5th Cir. 2010).  Specifically, the Fifth Circuit has determined that "it is a 'cardinal rule that a statute is to be read as a whole,' in order not to render portions of it inconsistent or devoid of meaning.'" ***In re Glenn***, 900 F.3d 187, 190 (5th Cir. 2018)

(citations omitted); *see also* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 180 (2012) (Under the harmonious-reading canon, "[t]he provisions of a text should be interpreted in a way that renders them compatible, not contradictory."). There is no language or provision in Texas § 9.343 expressly displaces or defeats Texas § 9.301. Likewise, there is no language or provision in Texas § 9.301 that excepts security interests and liens granted under Texas § 9.343 from being subject to its terms. Therefore, the Court refuses to apply the vague language of Texas Business and Commerce Code § 9.343(p) in such a broad manner that it would nullify the UCC law governing perfection and priority found earlier in the Texas Business and Commerce Code at Texas § 9.301. The Court is not tasked with the role of legislating, nor is it within the Court's province to posit or infer that the Texas Legislature intended for Texas § 9.343 to trump Texas § 9.301. Rather, the Court reads the plain language of Texas § 9.301 and Texas § 9.343 harmoniously because there is no other statutory language dictating otherwise.

Texas Producers also cite to Official Comment 7 to Delaware § 9-320 which states in the context of a discussion of Delaware § 9-320(d) that:

> Several [states] have adopted special statutes and non-uniform amendments to Article 9 to provide special protections to mineral owners, whose interests are highly fractionized in the case of oil and gas. *See* Terry I. Cross, Oil and Gas Product Liens – Statutory Security Interests for Producers and Royalty Owners under the Statutes of Kansas, New Mexico, Oklahoma, Texas, and Wyoming, 50 Consumer Fin. L. Q. Rep. 418 (1996). *Inasmuch as a complete resolution of the issue would require the addition of complex provisions to this Article, and there are good reasons to believe that a uniform solution would not be feasible, this Article leaves its resolution to other legislation.*

Del. Code Ann. tit. 6 § 9-320(s) official cmt. ¶ 7 (emphasis added). Texas Producers argue that the "other legislation" referred to in Official Comment 7 is Texas § 9.343.

The Court finds Comment 7 to be unpersuasive for a number of reasons. First, an official comment to statutory text is not binding law. Next, Comment 7 accompanies title 6, section 9-320

35

of the Delaware Code, which concerns the rights of a buyer in the ordinary course of business taking free of a security interest in certain instances. Section 9-320 is not a choice of law provision. Moreover, the existence of a non-binding comment stating that a "uniform solution" to protect oil and gas interests is "[left] to other legislation" does not require the Court to infer that the non-standard provision found in Texas § 9.343 unseats the law regarding perfection and priority at Texas § 9.301 when the explicit language of the statute does not provide for such an outcome.

Intervenors further contend that Agent is barred by waiver and estoppel by deed from claiming that Texas § 9.343 did not create a lien in favor of Intervenors and Texas Producers. Specifically, Intervenors cite to two sections in the Credit Agreement entered into by Debtor and Agent. *See Agent's App'x*, Pt. 2 (ECF No. 90-1). The first section identified that provisions of Texas § 9.343 would create a "First Purchaser Lien"[20] that would eliminate any amounts associated with that lien from Debtor's "Borrowing Base.[21]" *Id*. The second section provided that a lien under Texas § 9.343 would exist as a permitted lien on the Debtor's property, assets or revenues, whether owned at the time or thereafter acquired. *Id*. Intervenors argue that entering into the Credit Agreement with those terms caused Agent to "waive its right to assert that Texas § 9.343 can never create a lien against Debtor." *Intervenors' Response*, pp. 6–7 (ECF No. 103).

The Court disagrees with Intervenors that the two provisions cited from Agent's Credit Agreement caused Agent to either (i) waive its priority over or (ii) subordinate its priority over a security interest asserted under Texas § 9.343. Waiver is "the intentional relinquishment of a known right or intentional conduct that is inconsistent with asserting that right." ***Teal Trading and***

---

[20] The Credit Agreement defines "First Purchaser Liens" as including liens as defined by Texas § 9.343. *Agent's App'x*, Pt. 2 (ECF No. 90-1). Under the Credit Agreement, First Purchaser Liens are "permitted," meaning that they are "excepted from the covenant that Debtor may not create, incur, assume, or suffer to exist any liens on Debtor's property." *Agent's Reply to Response*, p. 17 (ECF No. 109) (citing *Agent's App'x*, Pt. 2 (ECF No. 90-1).

[21] The Credit Agreement "provides for calculation of the amount of credit available to Debtor at any given time through a 'Borrowing Base.'" *Agent's Reply to Response* , p. 17 (ECF No. 109) (citing *Agent's App'x*, Pt. 2 (ECF No. 90-1).

*Dev. LP v. Champee Springs Ranches Prop. Owners Ass'n*, 534 S.W .3d 558, 584 (Tex. App.—
San Antonio 2017, pet. filed). Waiver is a "question of fact" which requires the court to "examine
the acts, words or conduct of the parties, and it must be 'unequivocally manifested' that it is the
intent of the party to no longer assert the right." *Enterprise-Laredo Assoc. v Hachars, Inc.*, 839
S.W .2d 822, 835–36 (Tex. App.—San Antonio 1992). The Court reviewed the Credit Agreement
to evaluate the intent of the parties. Section 8.3 of the Credit Agreement provides:

> 4.1.4 Liens. No Grantor will create, incur, or suffer to exist any Lien on the
> Collateral owned by such Grantor except Liens permitted under Section 8.3 of the
> Credit Agreement and Liens described on Exhibit C-1; provided that nothing herein
> shall be deemed to constitute an agreement to subordinate any of the Liens of the
> Collateral Agent under the Transaction Documents to any Liens permitted under
> Section 8.3 of the Credit Agreement . . .

*Agent's App'x*, Pt. 2 (ECF No. 90-1).  The Court finds that the language at issue in the Credit
Agreement did not result in Agent waiving its right to assert that it has priority over any security
interests that arise under Texas § 9.343 because, as demonstrated by section 4.1.4 of the Credit
Agreement above, Agent's Credit Agreement did not "unequivocally manifest" its intention to
waive its lien rights or to subordinate its priority. *See Agent's App'x*, Pt. 2 (ECF No. 90-1) (stating
"nothing herein shall be deemed to constitute an agreement to subordinate any of the Liens of the
Collateral Agent"); *see also Enterprise-Laredo*, 839 S.W .2d at 835–36.

    For the reasons stated above, the Court will apply UCC § 9-301, which is the same in
Delaware as it is in Texas, to determine perfection and priority of security interests claimed by
Agent, Texas Producers, and Intervenors.

    **6. Perfection and Priority of Security Interests Alleged by Agent, Texas Producers, and Intervenors**

        **a. *Perfection and Priority of Security Interests in Goods, Inventory, Accounts, and Proceeds***

Under Delaware and Texas law, UCC § 9-301 determines which states' substantive laws

govern perfection and priority of security interests in personal property. Tex. Bus. & Com. Code Ann. § 9.301(1); Del. Code Ann. tit. 6 § 9-301(1). The location of a registered organization is the state in which the entity is organized. Del. Code Ann. tit. 6 § 9-307(e); Tex. Bus. & Com. Code Ann. § 9.307(e). Here, Debtor is organized in Delaware, so Delaware law applies.

Under Delaware law, Agent, Texas Producers and Intervenors were required to file a financing statement with the Delaware Department of State to perfect their security interests in goods, inventory, accounts, and proceeds. Del. Code. Ann. tit 6. § 9-310(a) (providing that, subject to exceptions provided in Del Code Ann. tit §§ 9-310(b) and 9-312(b), "a financing statement must be filed to perfect all security interests and agricultural liens"). Based on the evidence provided in the Motion for Summary Judgment, Agent has shown that it perfected its security interest in goods, inventory, accounts, and proceeds by filing UCC-1 financing statements with the Delaware Department of State on July 23, 2015 ("July 2015 Financing Statements"). *Agent's App'x*, Pt. 10 (ECF No. 90-9). Agent has also demonstrated that it filed the proper amendments to the July 2015 Financing Statements, which caused its security interests to remain continuously effective since July 23, 2015. *Id.* All Producers except Viceroy, RHEACO, and RADCO filed financing statements with the Delaware Department of State on various dates in January 2017. *Plaintiff's Supplement*, Pt. 2 (ECF No. 96-2). Producers and Intervenors' Responses do not discredit the validity of the July 2015 Financing Statements and amendments thereto.

Delaware law abides by the first-to-file-or-perfect rule, which causes "conflicting perfected security interests . . . [to] rank according to priority in time of filing or perfection." Del. Code Ann. tit. 6, § 9-322(a)(1). "Priority dates from the earlier of the time a filing covering the collateral is first made or the security interest . . . is first perfected." *Id.* Agent's July 2015 Financing Statements were filed before any of the Producers filed a UCC-1 statement in Delaware. Therefore,

the Court finds, as a matter of law, that Agent's security interest in goods, inventory, accounts, and proceeds primes any alleged security interest held by the Producers and Intervenors because the Agent's July 2015 Financing Statements were filed first.

### b. *Perfection and Priority of Deposit Accounts*

Cash proceeds of oil and gas produced by Texas Producers and Intervenors held by Debtor in deposit accounts as of the Petition Date are perfected subject to the "local law of [the] bank's jurisdiction." Del. Code. Ann. tit 6. § 9-304(a). "If an agreement between the bank and the debtor governing the deposit account expressly provides that a particular jurisdiction is the bank's jurisdiction for purposes of this part, this Article, or the [UCC], that jurisdiction is the bank's jurisdiction." Del. Code. Ann. tit. 6 § 9-304(b)(1). Debtor, Agent and JPMorgan Chase (as depositary), entered into the Blocked Account Control Agreement, which provides that New York law is JPMorgan Chase's jurisdiction. None of the parties dispute the validity of the Deposit Account Control Agreement. Therefore, the Court finds as a matter of law that perfection of security interests in Debtor's deposit accounts at JPMorgan Chase is governed by New York law.

Under New York law, Agent's liens on Debtor's deposit accounts as original collateral are perfected by control of the collateral. N.Y. U.C.C. § 9-312(b)(1). Control of a deposit account can be achieved through a deposit account control agreement, which is "an authenticated record that the bank will comply with instructions originated by the secured party directing disposition of the funds in the deposit account without further consent of the debtor." N.Y. U.C.C. § 9-104(a)(2); *see* N.Y. U.C.C. § 9-314(a). The Court finds that the Blocked Account Control Agreement establishes Agent's control over Debtor's deposit accounts at JPMorgan Chase. Producers and Intervenors do not argue that they entered into an agreement with Debtor's depository bank, nor do Producers and Intervenors contend that they attempted to establish control over Debtor's deposit accounts. As

such, the Court finds as a matter of law that Agent holds a first priority security interest in Debtor's deposit accounts.

## C. **Purchase-Money Security Interest Held by Producers**

Agent's Motion for Summary Judgment argues that even if Texas Producers can meet their burden to establish all elements of a security interest under Texas § 9.343, Agent's perfected security interests in Debtor's goods, inventory, accounts, proceeds, and deposit accounts still have priority over Texas Producers' liens by virtue of Tex. Bus. & Com. Code Ann. § 9.343(f). Because the Court found that Delaware law applies to determine perfection and priority of Texas Producers and Intervenors' security interests, the Court did not evaluate the merits of this legal argument made under Texas law.

## D. **Affirmative Defenses**

Producers assert the following affirmative defenses in their original answer:

> [Agent's] claims are barred by the doctrine of estoppel.

> [Agent's] claims are barred by the doctrine of unclean hands.

*Answers/Counterclaims*, (ECF No. 50 ¶¶ 63, 64). Additionally, Producers assert the following counterclaims:

> Producers seek judgment in [their] favor declaring the validity, priority, and superiority of its security interest and lien over the so-called "Bank Liens" asserted by Deutsche and Lenders in funds of Debtor constituting proceeds of FRE's sale of oil, gas and condensate of Producers.

> Further necessary or proper relief based upon a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment. 28 U.S.C. § 2202. Such further relief can include an award of attorney's fees and costs. Accordingly, Producers also seek recovery of their attorney's fees and costs pursuant to 28 U.S.C. § 2202.

*Answers/Counterclaims*, (ECF No. 50, ¶¶ 76, 80). Defendant Energy Reserves Group, LLC filed its Joinder to Producers' Original Answer and Counterclaim. (ECF No. 51). Agent filed its Reply to Producers' Counterclaim. (ECF No. 55). Thereafter, Debtor filed its answer to Agent's

Complaint, stating that the Court needs to determine the extent, validity, and priority of liens between Agent and Producers (ECF No. 61).

RADCO and RHEACO filed their Motion to Intervene in this Adversary Proceeding (ECF No. 66), which was granted on July 24, 2018 (ECF No. 85). Intervenors joined in the adversary proceeding as defendants seeking the same relief that Producers assert. Thereafter, Producers filed their First Amended Answer and First Amended Counterclaim (ECF No. 70). In their First Amended Answer and First Amended Counterclaim, Producers added the following affirmative defense: Agent's claims are barred by the doctrine of waiver. (ECF No. 70, ¶ 65). Producers also added a counterclaim for conversion, stating the following:

> As set forth above, Deutsche and Lenders have converted [Producers'] collateral. Deutsche and Lenders hold a second lien position and, by assuming actual dominion and control over [Producers'] collateral, have converted such collateral, to the exclusion of [Producers]. Moreover, upon information and belief, Deutsche and Lenders had actual knowledge of the rights of [Producers] to such collateral. [Producers] seek actual damages for all amounts so converted, in an amount in excess of the minimum jurisdictional limits of this Court.
>
> Deutsche and Lenders' actions were made with full knowledge that the amounts converted were subject to the first priority lien in favor of [Producers], and with specific intent to cause substantial injury or harm to [Producers]. Accordingly, pursuant to §41.001 *et. seq.* of the Texas Civil Practice & Remedies Code, Defendants are entitled to and seek recovery of recovery exemplary damages.

(ECF No. 70, ¶¶ 83, 84).[22]

Agent filed its Reply to Defendants' Amended Answer and Plaintiff's Answer to Amended Counterclaim, Including Motions Under Fed. R. Bankr. P. 7012(f) to Strike Affirmative Defenses and Under Fed. R. Bankr. P. 7012(b)(6) to Dismiss Counterclaim for Conversion. ("Motion to Strike") (ECF No. 91). Agent's Motion to Strike alleges that when affirmative defenses are

---

[22] Intervenors filed their answers at ECF Nos. 93 and 94, respectively. They both raise counterclaims for declaratory relief, conversion, and attorney's fees that are identical to those of Producers. The prayers include a request for actual and exemplary damages, plus pre- and post-judgment interest.

insufficiently plead, courts apply the same pleading standards as applied with respect to a complaint under Fed. R. Civ. P. Rule 12(b)(6). *Woodfield v. Bowman*, 193 F.3d at 362; *Cabin Foods, LLC v. Rich Prod. Corp.*, No. EP-11-CV-318-KC, 2012 WL 433115, at *1 (W.D. Tex. Feb. 8, 2012). Agent's Motion to Strike also argues that Producers' pleadings list the affirmative defenses without stating any facts in support and accordingly, as plead, should be stricken under Fed. R. Civ. P. 12(f) (as adopted by Fed. R. Bankr. P. 7012(b)). (ECF No. 91). Agent argues that because affirmative defenses are subject to the same pleading requirements as a complaint, Producers must plead enough facts to state a claim to relief that is plausible on its face. *Woodfield v. Bowman*, 193 F.3d 354, 362 (5th Cir. 1999); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007). Here, Agent alleges that Producers and Intervenors have not identified the elements of the defenses and have not pled any facts in support of those elements. Further, Agent argues that, because Producers and Intervenors have offered no proof or evidence in support of its affirmative defenses and counterclaims, that the Court should treat Producers and Intervenors' lack of proof and evidence as a "no evidence" summary judgment and render judgment in favor of Agent.

The court in *Cabin Foods* found that "a Rule 12(f) motion to strike a defense is proper when the defense is insufficient as a matter of law." 2012 WL 433115 at *1 Further, the court observed that "motions to strike are disfavored and are granted only when the defense fails as a matter of law or fact, the defense is completely unrelated to the claims at issue, or the maintenance of the defense would prejudice the movant." *Id.* (citation omitted).

Agent contends that Producers' pleading, which does no more than state the names of the affirmative defenses, is not enough to meet the pleading standards established by the Supreme Court in *Twombly* or *Iqbal* or to provide fair notice to Agent. *E.E.O.C. v. Courtesy Bldg. Servs., Inc.*, No. 3:10-CV-1911-D, 2011 WL 208408, at *5 (N.D. Tex. Jan. 21, 2011) ("Courtesy's

assertions of 'waiver, release, estoppel, or unclean hands' are not accompanied by any factual allegations giving notice of the nature of the defense."); ***Software Publishers Ass'n v. Scott & Scott, LLP***, No. CIV.A. 306CV0949-G, 2007 WL 2325585, at *2 (N.D. Tex. Aug. 15, 2007) (defendants' bald assertions that the plaintiff's claims are barred, in whole or in part, by the doctrines of waiver, estoppel, and unclean hands do not provide fair notice of the defenses).

Producers filed their Response to Agent's Motion to Strike Defenses and Motion to Dismiss Counterclaim for Conversion. (ECF No. 104).[23] Though Producers concede that certain courts have applied the ***Iqbal*** and ***Twombly*** heightened pleading standards to affirmative defenses, Producers argue that the district courts in the Western District of Texas have consistently held that notice of pleading of affirmative defenses is sufficient and that the ***Iqbal*** and ***Twombly*** standards do not apply to affirmative defenses. *See, e.g.,* ***BCOWW Holdings, LLC v. Collins***, No. 17-CA-00379, 2017 WL 4082626 at *4–6 (W.D. Tex. Sept. 15, 2017); ***Dyson v. Stuart Petroleum Testers, Inc.***, No. 1-15-CV-282, 2015 WL 4935527 at *3 (W.D. Tex. Aug. 18, 2015); ***Deaf Interpreter Serv., Inc. v. Webbco Enter., LLC***, Case No. 13-CV-867, 2014 WL 12489609 at *3 (W.D. Tex. June 30, 2014) (applying a "notice" standard to affirmative defenses as opposed to using a plausibility standard under ***Iqbal*** and ***Twombly***).

Producers also argue that a "no-evidence" motion for summary judgment is a creation of Texas state court, and is not available (and is procedurally improper) in federal court. ***360 Mortgage Group, LLC v. Homebridge Fin. Serv.,*** No. 14-CA-00847, 2016 WL 900577 at *2, n.2. (W.D. Tex. Mar. 2, 2016); ***Trautmann v. Cogema Mining, Inc.,*** No. 5:04-cv-117, 2007 WL 1577652, at *3 (S.D. Tex. May 30, 2007); ***Mallory v. Lease Supervisors***, No. 7:16-CV-248, 2017

---

[23] In its First Amended Answer, RADCO also asserts counterclaims, seeks declaratory judgment that its liens are superior to Agent's, and requests attorney's fees. (ECF No. 97, ¶¶ 85-90). RHEACO asserts the same counterclaims in its First Amended Answer. (ECF No. 99, ¶¶ 85-7, 1-2 (Count 2)).

WL 5147095 at *1 (W.D. Tex. Aug. 28, 2017). (ECF No. 105, ¶ 35). In **Mallory**, the district court

stated:

> Unlike Texas law, federal law does not recognize "no evidence" motions for summary judgment. *See* Fed. R. Civ. P. 56(a). The concept of a "no evidence" summary judgment "neither accurately describes federal law nor has any particular import in the vernacular of federal summary judgment procedure." *Royal Surplus Lines Ins. Co. v. Brownsville Indep. Sch. Dist.*, 404 F. Supp. 942, 948 (S.D. Tex. 2005). Rather, "federal law contemplates a shifting burden" in which the party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Id*. Thus, the Court will analyze Defendants' motion under the burden-shifting framework of Rule 56.

2017 WL 5147095 at *1. As to the burden shifting frame work in Rule 56, the district court stated

in **Trautmann** that

> before the non-moving party is required to produce evidence in opposition to the motion, the moving party must first satisfy its obligation of demonstrating that there are no factual issues warranting trial.
> ...
> This initial burden remains with the moving party even when the issue involved is one on which the non-movant will bear the burden of proof at trial. *Contrary to the defendant's assertions, the Court in* Celotex *did not hold that any time a party with the burden of proof at trial is faced with a motion for summary judgment it must come forward with competent evidence to support its theory of liability, regardless of what showing the movant has made.*

2007 WL 1577652 at *3 (citing **Russ v. Int'l Paper Co.**, 943 F.2d 589, 592 (5th Cir. 1991)

(emphasis in original).

Producers also argue that the issue of waiver and estoppel are fact issues that require this

Court to make a factual determination, and, as such cannot be decided as a matter of law. Producers

state that waiver is an intentional relinquishment of a known right or conduct inconsistent with

that right. **Teal Trading**, 534 S.W.3d at 584. Producers note that estoppel is a defense which

precludes a party from taking positions inconsistent with or contrary to prior positions. **In re**

**Marriage Stroud**, 376 S.W.3d 346, 356 (Tex. App.—Dallas 2012, pet. denied); **XTO Energy Inc.**

**v. Nikolai**, 357 S.W.3d 47, 56 (Tex. App.—Fort Worth 2011, pet. denied).

As an initial matter, the Court agrees with Producers that a "no evidence" motion for summary judgment is a Texas state court procedural motion that has no application to federal court. As noted herein, the Western District of Texas District Courts have declined to apply "no evidence" summary judgment motions to federal practice and require the moving party to put on sufficient evidence in support of its claims.

In addition, the parties acknowledge that the Fifth Circuit has not expressly applied the *Twombly* and *Iqbal* plausibility standards to affirmative defenses. In the absence of further guidance from the Fifth Circuit, the Court finds that Fed. R. Civ. P. 8(c) only requires a fair notice standard of pleading. *BCOWW Holdings*, 2017 WL 4082686 at *4–6 (W.D. Tex. Sept. 15, 2017). That said, Producers must still advise the Court and Agent of the factual basis of its affirmative defenses. This adversary proceeding seeks a determination of the extent, priority, and validity of liens. The Court cannot discern how the affirmative defenses of estoppel and unclean hands rebut a request for a declaratory judgment action where Producers and Intervenors concede the validity and extent of the Agent's liens. Producers provide no basis for what kind of estoppel applies nor do Producers state the nature of the Agent's unclean hands. As such, the Court finds that Agent's Motion to Strike the affirmative defenses of estoppel and unclean hands should be granted. As to the issue of waiver, because the Court has found that under Delaware law that the Agent has a first priority lien in Debtor's goods, inventory, accounts, proceeds, and deposit accounts as to Texas Producers, the affirmative defense of waiver can no longer apply. Therefore, the Court also strikes Producer's affirmative defense of waiver.

## E. Counterclaim of Conversion

Agent argues that Producers have failed to provide any evidence in support of their

counterclaim for conversion. *Motion for Summary Judgment*, p. 31 (ECF No. 89).[24] As such, Agent asks that the Court grant summary judgment in its favor on the absence of proof of Producers' establishing the elements of conversion.

In their Amended Answer to Complaint, Producers allege a counterclaim for conversion of money on deposit in Agent's bank accounts, based on two allegations. The first allegation is that Producers, under either Texas § 9.343 or the Oklahoma Lien Act have a "first priority perfected security interest, as secured parties, to secure the obligations of Debtor as the 'first purchaser' of oil and gas production," *Producers' Amended Answer to Complaint,* (ECF No. 70, ¶74). The second allegation is that "in December 2017 and/or January 2018, Deutsche and Lenders (1) exercised cash dominion over [First River] and (2) swept substantially all of the funds held by the Debtor, including the amounts that represented proceeds from [First River's] sale of oil, gas and condensate, on which the Producers held first and priority liens." *Id*. at ¶75. Producers further allege:

> Deutsche and Lenders have converted [Producers'] collateral, . . . hold a second lien position and, by assuming dominion and control over [Producers'] collateral have converted such collateral, to the exclusion of [Producers]"
>
> - upon information and belief, that "Deutsche and Lenders had actual knowledge of the rights of [Producers] to such collateral."
>
> and
>
> -that Deutsche and Lenders actions were made with full knowledge that the amounts converted were subject to the first priority lien in favor of [Producers], and with specific intent to cause substantial injury or harm to [Producers].

(ECF Nos. 70, ¶¶ 83 and 84).

---

[24] As stated in this Memorandum Opinion, the Court finds that: (1) Producers and Intervenors' counterclaims for a declaratory judgment on the priority of their liens and request for attorney's fees as to Texas oil proceeds is denied; and (2) Producers' request for a declaratory judgment and attorney's fees as to proceeds from Oklahoma production is granted.

Agent asserts that a claim for conversion is defined as "the wrongful exercise of dominion and control over another's property in denial of or inconsistent with his rights." ***Bandy v. First State Bank***, 835 S.W.2d 609, 622 (Tex. 1992) (quoting ***Tripp Village Joint Venture v.MBank Lincoln Centre, N.A.***, 774 S.W.2d 746, 750 (Tex. App.—Dallas 1989, writ denied)). Agent notes that a conversion claim has four essential elements: (i) the plaintiff owned, possessed, or had the right to possess property; (ii) the defendant unlawfully and without authorization assumed and exercised control over the property to the exclusion of, or inconsistent with, the plaintiff's rights as an owner; (iii) the plaintiff demanded return of the property; and (iv) the defendant refused to return the property. ***Grand Champion Film Production, L.L.C. v. Cinemark USA, Inc.***, 257 S.W. 3d 478, 485 (Tex. App.—Dallas 2008, no pet.) (citation omitted).

Agent argues that Producers must show a "right of immediate possession," or their claim for conversion fails. ***United States v. Boardwalk Motor Sports, Ltd.***, 692 F.3d 378, 381 (5th Cir. 2012) (applying Texas law). Agent contends that claims for conversion of money under Texas law must meet certain requirements in addition to those set forth above, in particular:

> [A]ctions for conversion of money are available in Texas only where the money is (1) delivered for safe keeping; (2) intended to be kept segregated; (3) substantially in the form in which it is received or an intact fund; and (4) not the subject of a title claim by the keeper.

*Id.* Agent states that the property alleged to have been converted is money in deposit accounts. Agent posits that Producers have not, and cannot, allege that money: (1) was delivered to the deposit accounts for safe keeping; (2) was intended to be kept segregated; (3) is substantially in the form in which it is received or an intact fund; and (4) was not the subject of a title claim by the keeper.

Agent argues that while the Producers and Intervenors claim liens on "oil" pursuant to Texas § 9.343 and/or the Oklahoma Lien Act, Producers do not allege that they have liens on the

47

money in deposit accounts, and they do not allege that the statutes that would entitle them to a lien on such money in deposit accounts, much less the right to "immediately possess" the money in deposit accounts. Moreover, Agent maintains that Producers do not, and cannot, allege that Agent "unlawfully and without authorization assumed and exercised control over the property." Agent notes that some of the Producers allege that Agent held a "second lien position" on the money in deposit accounts; although Agent contends that it has a first lien position, and Producers' admission of the Agent's lien on the deposit accounts precludes any finding that the Agent acted unlawfully or without authorization. Further, Agent states that Producers do not allege that Producers demanded return of the money in deposit accounts or that Agent refused to return the money in deposit accounts. Finally, Agent argues that Producers have not only failed to plead a plausible claim for conversion, their reliance on Texas § 9.343 and the Oklahoma Lien Act conclusively establishes that a claim for conversion is not available to Producers under Texas law.

Producers state that a cause of action for conversion of a secured party's collateral is available to Producers in this adversary proceeding. *See **Trustmark Nat'l Bank v. Tegeler (In re Tegeler)**,* 586 B.R. 598, 693 (Bankr. S.D. Tex. 2018) (applying conversion to a dischargeability determination under § 523(a)(6)). Producers argue that the conversion counterclaim specifically asserts that Producers had a first and prior security interest in the funds being held by the Debtor, representing proceeds of the sale. Producers argue that Agent would be liable to Producers for conversion of the collateral wrongfully ceased by Agent, should the Court rule in Producers' favor. Moreover, Producer states that, cash proceeds from a sale of collateral are subject to the security interest in the collateral itself, and the secured parties are entitled to recover cash proceeds from any unauthorized subsequent transferees. ***ITT Commercial Fin. Corp. v. Bank of the West***, 166 F.3d 295, 305 (5th Cir. 1999).

The Court has found that: (i) Agent has a first lien on the proceeds of production of oil produced in Texas, and (ii) Agent has a first lien on Debtor's deposit accounts at JPMorgan Chase in New York. As noted herein, Agent's security interest primes the Texas Producers' alleged security interest under Delaware law. As such, there is no conversion of the Texas Producers' collateral because the collateral is subject to the Agent's superior security interest. That said, the Court also found that under the Oklahoma Lien Act, Oklahoma Producers have a security interest that is superior to that of the Agent's for oil and gas and proceeds thereof of oil produced in Oklahoma. Therefore, there is a question of fact as to the extent of Oklahoma Producers' security interest in any cash proceeds from the production of the oil in Oklahoma. The Court agrees with Agent that Producers' counterclaim as plead is deficient because there are no underlying allegations to support a claim for conversion. Now that the Court has determined that Oklahoma Producers have a superior security interest in the cash proceeds from Oklahoma production, the Court will allow Oklahoma Producers to replead their counterclaim for conversion. Further, the Court will grant Oklahoma Producers' counterclaim for a declaratory judgment on the proceeds from the production of oil from Oklahoma. After the Court determines the extent and amount of Oklahoma Producers' security interest in the Oklahoma proceeds, Oklahoma Producers may file their motion for attorney's fees.

### CONCLUSION

For the foregoing reasons, IT IS THEREFORE ORDERED that Agent's Motion for Summary Judgment and Alternative Motion for Partial Summary Judgment (ECF No. 89) is GRANTED, IN PART and DENIED, IN PART. The Court will issue an Order consistent with this Memorandum Opinion.

### ###